# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2025

Lyle W. Cayce
Clerk

No. 24-60295

Renika Franks,

*Plaintiff—Appellant*,

*versus*

City of Oxford, Mississippi; Oxford Housing Authority,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 3:22-CV-194

Before Elrod, *Chief Judge*, Higginbotham, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

Police Officer Renika Franks appeals the dismissal of her employment discrimination and retaliation claims against the City of Oxford, Mississippi (the "City"), and the Oxford Housing Authority ("OHA"). We AFFIRM.

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-60295

I

In 2004, the City agreed to assign at least two full-time police officers to the police station at OHA, which had over 200 low-income housing units.

Franks began working for the City in 2015, and she transferred to OHA in 2017. Officer Cody Pruitt transferred to OHA in August 2020. Captain Alan Ivy oversaw the police officers stationed at the OHA unit and told Franks before Pruitt's transfer that she "was in charge because she was the senior officer at [OHA]."[1] But after Pruitt's arrival, Ivy "started talking to [Pruitt] like he was in charge."

A

In 2021, OHA director Jonathan Hill created a new position, the Resident Security and Services Coordinator, to act as the point person between the City police department and OHA. Although the position was not intended to be supervisory, the Resident Security and Services Coordinator would receive an additional stipend; the total compensation for the position would be an amount equal to a lieutenant's salary. Franks and Pruitt were the only applicants for this position.

In August 2021, a panel—Ivy, Teasha Sanders, and Andrea Griffin—interviewed Franks and Pruitt. The panel recommended hiring Pruitt as the Resident Security and Services Coordinator. Hill and Oxford Police Chief Jeff McCutchen—who had authority to approve or veto the decision—agreed with their recommendation. McCutchen recommended to the Board

---

[1] Until 2018, the longest-tenured police officer at OHA was considered the "officer-in-charge" of the unit. The officer-in-charge unofficially "[held] the rank of sergeant" but did not receive a formal title or additional compensation for holding this position. In 2018, Chief of Police Joey East removed all references to the officer-in-charge position in the operating procedures for OHA.

of Aldermen that Pruitt be hired as the Resident Security and Services Coordinator, and the Board voted accordingly.

McCutchen broke the news to Franks, explaining in a recorded conversation that the panel recommended hiring Pruitt because they thought he "had her in experience." He told Franks that he had no input on the decision other than telling the panel to "pick the best person."

Two days later, Franks emailed Ivy requesting "details as to where [she] was deficient in the experience that [Pruitt] possessed." Ivy and Assistant Chief of Police Sheridan Maiden met with Franks and, in a recorded conversation, told her that Pruitt had been selected because he had more experience. Ivy noted, for example, that Pruitt had been a full-time police officer since 2010 as well as the officer-in-charge in both the downtown and OHA units. Ivy and Maiden also identified several statistics in which Pruitt had outperformed Franks, such as ticket writing, arrests, vehicle stops, accident reports, and written reports. They told Franks that she needed more experience and exposure inside and outside of OHA and that she needed to take more initiative.

Franks met with McCutchen again the next day. In a recorded conversation, Franks said that Ivy and Maiden told her that she did not write enough tickets or arrest enough people. McCutchen explained that he did not care about arrests and tickets, only answered calls and reports written, which are indicative of activity in the field. He then discussed the statistics that he considered in approving the decision to hire Pruitt. For example, from January 2021 to August 2021, Pruitt answered 208 calls and wrote 83 reports, while Franks answered 53 calls and wrote 21 reports. McCutchen told her that he wanted to help her grow and support her in future leadership opportunities.

No. 24-60295

B

In December 2021 and January 2022, Franks filed EEOC charges against the City and OHA, alleging that she had not been selected for the Resident Security and Services Coordinator position "as a result of racial discrimination." She claimed that she had been the officer-in-charge of OHA until Pruitt transferred to the unit. "Because [she] was a good officer, there was no legitimate reason why [she, a black officer,] should have been demoted in favor of the white officer."

Later in 2022, McCutchen decided to eliminate the officer positions at OHA and reassign Franks and Pruitt due to low call volume. In June 2022, he met with Franks and Pruitt, offering them a choice of transferring to the patrol, downtown, or school units. Franks chose to be transferred to the patrol unit, and Pruitt left the City police department in July 2022.

On September 9, 2022, Franks sued the City and OHA, asserting claims for race and gender discrimination and retaliation. She claimed that the defendants had "devised a scheme whereby they would come up with a new job title, thereby effectively eliminating [Franks's] position as [officer-in-charge at OHA]." According to Franks, the City and OHA decided to "conduct interviews to make it look like everything was legitimate, even though the decision had already been made to demote [Franks] and make Pruitt the [officer-in-charge]." She also claimed that the City had "eliminated the law enforcement position at the OHA" in retaliation against her for bringing EEOC charges.

The City and OHA separately moved for summary judgment. The district court granted both motions and dismissed Franks's claims. While the district court found that Franks had established a *prima facie* case of race or gender discrimination, it also found that the City and OHA had proffered a legitimate, non-discriminatory reason for the decision to hire Pruitt, and

4

Franks had failed to produce evidence that this reason was a pretext for discrimination. It also found that Franks had failed to establish an adverse employment action or a causal connection between her EEOC charge and the decision to eliminate the OHA station.

## II

"We review the district court's ruling on a motion for summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party." *Ramirez v. Killian*, 113 F.4th 415, 421 (5th Cir. 2024). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Sweetin v. City of Texas City*, 48 F.4th 387, 391 (5th Cir. 2022) (quoting *McCarty v. Hillstone Rest. Grp., Inc.*, 864 F.3d 354, 357–58 (5th Cir. 2017)).

But "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment." *Ramsey v. Henderson*, 286 F.3d 264, 269 (5th Cir. 2002) (quotation omitted). And this court may grant summary judgment when "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993). "In addition, a panel may affirm summary judgment on any ground supported by the record, even if it is different from that relied on by the district court." *Reed v. Neopost USA, Inc.*, 701 F.3d 434, 438 (5th Cir. 2012) (citation omitted).

## III

Franks first challenges the dismissal of her race and gender discrimination claims.

No. 24-60295

Under Title VII, an employer cannot "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual′s race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Where direct evidence of discrimination is lacking, this court applies the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). *See Sanders v. Christwood*, 970 F.3d 558, 561 (5th Cir. 2020). The plaintiff under this framework bears the initial burden to establish a *prima facie* case of discrimination. *Watkins v. Tregre*, 997 F.3d 275, 281 (5th Cir. 2021). If successful, "the burden of production shifts to [the defendant] to proffer a legitimate, nondiscriminatory reason for [its] action." *Id.* If the defendant meets that burden, "the presumption of discrimination disappears," and the plaintiff must produce substantial evidence indicating that the defendant's proffered reason is a pretext for discrimination. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 636 (5th Cir. 2011); *see also Outley v. Luke & Assocs., Inc.*, 840 F.3d 212, 216 (5th Cir. 2016).

A

As an initial matter, Franks argues that the district court erred in considering the three unsworn recorded conversations between Franks and other members of the City police department. Franks admittedly never objected to the recordings as improper evidence, however. This argument is therefore forfeited on appeal. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal"); *see also Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339–40 (5th Cir. 2005) ("If a party fails to assert a legal reason why summary judgment should not

6

be granted, that ground is waived and cannot be considered or raised on appeal.").

B

Franks also argues that the district court erred in dismissing her discrimination claims because she produced substantial evidence that the City's proffered reason for hiring Pruitt was a pretext for discrimination. We disagree.

Franks first claims that the City and OHA "abandoned the City's custom of appointing the senior officer at [OHA] as the [officer-in-charge]." The officer-in-charge title, however, was not an official designation because the City amended its policies to remove references to an officer-in-charge designation in 2018, before Pruitt transferred to OHA. And as Franks testified in her deposition, the unofficial title of officer-in-charge did not come with an official designation from the city or an increase in pay. This evidence does not demonstrate that the reasons proffered for hiring Pruitt were pretextual.

Second, Franks alleges that the City and OHA used a "bogus contract to give a new name [the Resident Security and Services coordinator] to the old [officer-in-charge] position." Franks did not raise this argument in the district court and therefore has forfeited it on appeal. *Rollins*, 8 F.4th at 397.

Next, Franks claims that although the two women who interviewed Pruitt and Franks were also Black, they were "subject to be influenced by the racially-biased [Ivy and Hill]." Both women testified that they preferred Pruitt, however, and that no one told them to pick him for the Resident Security and Services Coordinator position. Franks also offered no evidence to support Ivy and Hill's alleged racial animus.

Finally, Franks alleges that the City and OHA "gave inconsistent explanations" for the decision to hire Pruitt. She claims the City and OHA first told her that they hired Pruitt because he wrote more tickets and arrested more people. Later, they told her that he was hired because he had more experience. According to the recorded conversations between Franks and members of the City police department, McCutchen, Ivy, and Maiden all told Franks that Pruitt had been selected because he had more experience. And while Ivy and Maiden did discuss arrest and ticket statistics, this was in the context of explaining what statistics are used to evaluate when officers are in the field. The focus of this discussion was on increasing Franks's "contact" and "exposure" with the public rather than attributing Pruitt's selection to the disparities in arrests and tickets.

Franks's "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden in a motion for summary judgment." *Ramsey*, 286 F.3d at 269. She did not meet her burden to demonstrate that the reasons offered for hiring Pruitt were a pretext for discrimination.

C

Franks also argues that she offered evidence that the real decisionmakers for the position—Ivy and Hill—were biased influencers and agents, which makes their employers liable. We disagree.

In effect, Franks argues that she has raised a genuine issue of material fact of a "cat's paw" situation, namely a situation where an employer's decision is influenced by other individuals harboring discriminatory animus. *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). "Plaintiffs [often] use a cat's paw theory of liability when they cannot show that the decisionmaker—the person who took the adverse employment action—harbored any retaliatory animus." *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015). The

cat's paw theory recognizes that the "discriminatory animus of a manager can be imputed to the ultimate decision maker if the decision maker acted as a rubber stamp, or the cat's paw, for the subordinate employee's prejudice." *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (internal quotation marks omitted). Under this theory, a plaintiff must establish that: (a) a coworker exhibited retaliatory animus, and (b) the same coworker possessed leverage, or exerted influence, over the decisionmaker. *Roberson v. Alltel Information Services*, 373 F.3d 647, 653 (5th Cir. 2004). "Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action." *Zamora*, 798 F.3d at 331.

The City argues that Franks forfeited this argument, but even viewing the evidence in the light most favorable to Franks, *Ramirez*, 113 F.4th at 421, she still fails to show pretext under the cat's paw theory. In Mississippi, employment decisions for municipalities are made by the Board of Aldermen. *See* Miss. Code §§ 21-3-5; 21-21-3. Here, the evidence shows that McCutchen recommended to the Board that Pruitt be hired for the new position; the Board considered this recommendation and voted accordingly. Although McCutchen received that recommendation from the interviewing panel, he had the authority to veto or approve the decision, and he agreed with the panel's recommendation. *Rios v. Rossotti*, 252 F.3d 375, 381–82 (5th Cir. 2001); *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 604 n.14 (5th Cir. 2001).[2] Further, Franks does not allege that McCutchen or the Board harbored any unlawful animus towards her. *See, e.g., Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1294 (10th Cir. 2013) (explaining that a "necessary

---

[2] *See also Okon v. Harris Cnty. Hosp. Dist.*, 426 F. App'x 312, 318–19 (5th Cir. 2011) (explaining that for there to be cat's paw liability, a biased recommendation must be accepted "without evaluation").

element to a subordinate bias claim is the decisionmaker's uncritical reliance on facts provided by a biased supervisor").

The district court correctly determined that Franks did not establish a genuine issue of material fact as to whether the reasons offered for Pruitt's selection as the Resident Security and Services Coordinator were a pretext for discrimination.[3]

## IV

Franks also challenges the dismissal of her retaliation claim. She argues that she has established a causal connection because, just months after she filed her EEOC charges, McCutchen dissolved the OHA unit and transferred her to the patrol unit. We disagree.

A Title VII retaliation plaintiff must establish that: "(1) the employee engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; *and* (3) a causal connection exists between that protected activity and the adverse employment action." *Zamora*, 798 F.3d at 331 (emphasis added). A retaliation claim carries a higher causation standard such that a plaintiff "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* (quoting *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013)).

Even assuming, without deciding, that Franks's transfer to the patrol unit constitutes an adverse employment action, "[i]t is well established that,

---

[3] OHA also moved for summary judgment on the basis that the City was Franks's sole employer. The district court did not address this argument, noting that this issue is "beside the point" because "Ms. Franks's discrimination claim plainly fails the *McDonnell Douglas* test." Because we agree that her discrimination claim fails, we do not need to consider this issue.

in determining whether an adverse employment action was taken as a result of retaliation, our focus is on the final decisionmaker." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (internal quotation marks and citation omitted). Here, because McCutchen was the final decisionmaker in both dissolving the OHA unit and transferring Franks to the patrol unit, Franks must identify a genuine issue of material fact as to whether these decisions occurred because of her EEOC charges.

Franks conceded that McCutchen had no retaliatory motive or racial animus towards her—the bases for her EEOC charges. The record evidence instead shows that McCutchen helped and supported Franks. For example, he set up a grocery account for her from police department funds when she was struggling financially. Franks also told McCutchen "about Captain Ivy's dislike for [her]," and McCutchen moved her out from under Ivy's supervision while she was still stationed at OHA.

Without evidence that points to McCutchen eliminating the OHA unit and transferring Franks because she filed her EEOC charges, her retaliation claim must fail. *Armstrong*, 997 F.2d at 67 (summary judgment is appropriate when "critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.").

V

The district court's judgment is AFFIRMED.